## SUNITED STATES DISTRICT COURT
## DISTRICT OF ALASKA

UNITED STATES OF AMERICA,

                    Plaintiff,

          vs.

NANCY MARIE MILLER,

                    Defendant.

1:21-CR-00011-TMB-MMS

**FINAL REPORT AND
RECOMMENDATION ON
MOTION TO SUPPRESS [DKT. 72]**

## l.    MOTION PRESENTED

The indictment, filed in November 2021, charges Nancy Marie Miller with one count of attempting to possess controlled substances with intent to distribute,[1] one count of possessing controlled substances with intent to distribute,[2] and one count of possessing firearms in furtherance of drug trafficking.[3] Dkt. 2. Miller has moved to suppress all statements made by her during the interrogations on July 20, 2021, on several bases: (1) Miller was in custody for *Miranda* purposes when Detective Carl Lundquist asked Miller if she "could hang out" at her residence, and that "[he would] rather [she] be here" for a K-9 unit to arrive and inspect a mailed package; (2) Detective Lundquist employed a deliberate two-step strategy to obtain a pre-warning confession from Miller that was not cured by a "midstream and halfhearted *Miranda* advisement"; and (3) Miller invoked her

[1] 21 U.S.C. §§ 841(a)(1), (b)(1)(A)
[2] 21 U.S.C. § 841(a)(1), (b)(1)(A)
[3] 18 U.S.C. § 924(c)(1)(A)(i)

right to counsel in unambiguous and unequivocal terms when she purportedly stated that "she needed to see a lawyer because she didn't know what to do" [*sic*] *See generally* Dkt. 72. The government responds that (1) the initial interrogation was not custodial in nature because it was conducted at Miller's residence and without restraint on "freedom of movement"; (2) should this Court conclude that Miller was in custody for *Miranda* purposes, Detective Lundquist's midstream *Miranda* warning renders Miller's statements admissible; and (3) Miller did not invoke her right to counsel when she purportedly communicated to law enforcement that "maybe I should get a lawyer, I don't know what to do." [*sic*] *See generally* Dkt. 78.

As an initial matter, there is no need to hold an evidentiary hearing. Both parties have filed substantive briefings, have submitted numerous exhibits, including audio exhibits, and Miller has since retracted her request for an evidentiary hearing. The briefings, exhibits, and extensive litigation have produced a sufficiently developed record that allows this Court to recommend a ruling on Miller's [Dkt. 72] motion.

This Court hereby issues its Final Report and Recommendation regarding Miller's Motion to Suppress. Dkt. 72. For the reasons below, Miller's Motion to Suppress should be **DENIED**. 28 U.S.C. § 636(b)(1)(B).

## II. FACTUAL HISTORY

The following facts are drawn from audio recordings of law enforcement interviews, from law enforcement reports, and from party briefings. Def. Ex. D-1 to D-7; Gov. Ex. 1 to 4; Dkt. 72, Dkt. 78.

### A. The First Package

The investigation into Nancy Miller began on July 20, 2021, when her uncle, Terry Miller, opted to wait at his residence due to rescheduled traveling plans. Def. Ex. D-1, D-3; Def. Ex. D-4 at 03:28-04:01. Terry Miller's decision had the collateral effect of spoiling a drug trafficking scheme because at around 3:00 p.m., Terry Miller intercepted a "suspicious" package mailed to his address. Def. Ex. D-1, D-2. The package was postmarked from "Industrial Provisions, 17391 WA-106, Belfair, WA 98528." *Id.* Terry Miller was unfamiliar with the company or the company's address. Def. Ex. D-1, D-2, D-3. Things went from bad to worse for the scheming traffickers when Terry Miller opened the package, observed a crystal-like substance, and concluded that it was likely his diabetic treatment that was "wrapped in the crystals to keep them cool." *Id.* Despite having some knowledge of drug substances, Terry Miller nonetheless tasted the substance from the suspicious package but could not discern what it was, other than "it didn't taste like salt." [*sic*] *Id.* Mr. Miller had grievously misapprehended the situation. The shipment did not contain his diabetic medicine, and it was not wrapped in crystals to keep it cool. The crystalline substance referred to in the argot as "crystal," was in fact, methamphetamine. *Id.* Law enforcement was thereafter alerted. *Id.*

Officer John Cryderman arrived at Terry Miller's residence around 3:30 p.m. *Id.* Terry Miller notified Officer John Cryderman of what had occurred and relinquished any rights to the package. Officer Cryderman inspected the package and observed, among other things, two "bag[s] of crystallized substance." Def. Ex. D-1.

Officer Cryderman transported the package to the law enforcement station for further inspection. *Id.* Officer Cryderman researched the "Industrial Provisions" company;

and found that it did not exist. *Id.* Officer Cryderman then researched the return address of the company; learning it was a residential address. *Id.* At around 4:30 p.m., the investigation picked up when Officer Cryderman transferred possession of the package to Detective Lundquist, who verified that it was methamphetamine. Def. Ex. D-1, D-2. In an unrecorded interview, Officer Dominic Branson called Terry Miller to inquire into the methamphetamine. Def. Ex. D-3. Terry Miller denied any knowledge of any methamphetamine trafficking but recalled that he had fired employees that were known to consume methamphetamine. *Id.* One such employee was Brett King. *Id.*

**B. The Second Package**

Law enforcement soon discerned that a second package, labeled with the same company and company address, but now for "Nance Miller," [*sic*] was scheduled for delivery at Nancy Miller's residence. Def. Ex. D-2, D-3. Nancy Miller[4] had, at some point, dated King. *Id.* Armed with that preliminary information, Postal Service Inspector Charles Nalley and Detective Lundquist traveled to Miller's residence at around 5:10 p.m., approached the residence, but Miller "opened the door before" Detective Lundquist "was able to knock." *Id.* The first thirty seconds of the interaction occurred outside of Miller's home. Def. Ex. D-4 at 00:01-00:30. The audio recording begins with Detective Lundquist inquiring into the second package, and Miller confirming that she received an air conditioner inside the package. *Id.* Miller agrees to Detective Lundquist's request to inspect the package and both law enforcement officials are invited to "come inside." *Id.* Now

---

[4] Terry Miller is of limited, factual value after his initial involvement. In light of that, Nancy Miller will now be referred as "Miller" for efficiency purposes.

inside, Detective Lundquist seemingly inquired into a different package when he asked, "what about, *that* box?" *Id.* at 00:31-00:47 (emphasis added). Miller paused, but ultimately denied that she had received "that" package; and in a further ten second span, twice denied that she received or had knowledge of the package when Detective Lundquist asked, "No?" and "Any ideas about it?" *Id.* at 00:48-00:59. Detective Lundquist's line of questioning returned to the second package, and Miller responded that she had actually retrieved the second package from a designated location. *Id.* at 01:00-01:10. Miller and both officers then walk out of Miller's residence and toward the designated location after Miller agreed to show the location. *Id.* at 01:11-02:50. Detective Lundquist, during this walk, inquired into Miller's daily whereabouts, about any co-tenants, and regarding the logistics of the second package. *Id.* Miller lived alone, was at work earlier in the day, and again emphasized that she retrieved the second package from the designated location. *Id.* The audio is unclear, but it appears that Miller inquired into law enforcement's interest in these packages. *Id.* at 02:47-03:10. The following is detective Lundquist's response: "I don't know exactly. I know there was another box, that was fairly similar to it, that contained a lot of drugs. So that's why we're trying to find this one." [*sic*] *Id.*

SA Nalley interjected by asking if "you have any friends that use your address to get mail. Lot of people do that." *Id.* at 03:11-03:26. Miller revealed that, among other people, King had utilized Miller's address for about six to seven months. *Id.* at 03:28-04:01. Since the end of their "rocky" relationship, King had turned to controlled substances, and frequently visited Miller's neighborhood and the designated location for packages. *Id.* at 04:02-04:39. Miller, without prompting, offered that King was overseeing a sex trafficking

ring. *Id.* at 04:40-06:00. Detective Lundquist focused the questioning back to the second package, and warned that the post office had "cameras" in the event that Miller was lying. *Id.* at 06:00-07:20. Miller and the two officials, during this interval, walked back from the package delivery location to Miller's mailbox. *Id.* The remainder of Def. Ex. D-4 is law enforcement officials re-asking the previous investigatory questions. *Id.* at 07:30-09:37. Of importance is Miller's stated belief that it was "drugs, probably" inside any packages that may have been mailed in the past. *Id.* at 09:00-09:17. Detective Lundquist pauses the audio recording to make a phone call. *Id.*; Dkt. 78-1.

The Def. Ex. D-5 recording begins in the middle of a conversation, at around 5:35 p.m. It appears, from the context of the conversation, that Miller and the law enforcement officials are inside or near the entrance to Miller's residence. Miller agrees to entrust the second package to law enforcement for investigatory purposes. Def. Ex. D-5 at 00:01-00:13. Detective Lundquist asks if Miller will be "home all night," with Miller responding that she would "be running to the store … I'll be back in about forty-five minutes." *Id.* at 00:14-00:20. Law enforcement writes down Miller's contact information to return the second package at a later unspecified time. *Id.* at 00:21-00:55. Detective Lundquist, at this juncture, mentioned that the next investigatory step was to have a K-9 sniff the second package for controlled substances. *Id.* at 00:56-01:17. No protests from Miller. *Id.* at 01:18-01:30. To the contrary—Miller "trusts" law enforcement with the package. *Id.* Twenty seconds later, Detective Lundquist steps out to make another phone call to inquire into whether it would be "easier" for law enforcement to bring the K-9 to Miller's residence.

*Id.* at 01:31-02:05. Miller stressed that a neighbor might get "uptight" as to the K-9's presence because the neighbor owned a large dog. *Id.*

The next audio recording again begins in the middle of a conversation between Miller and SA Nalley. Def. Ex. D-6; Gov. Ex. 1.[5] Detective Lundquist mentioned that the K-9 would be stationed "at the end of the driveway" to avoid any concerns from Miller's neighbor. *Id.* at 00:01-00:17. In that same breath, Detective Lundquist again asked if Miller had planned to visit a grocery store. *Id.* at 00:18-00:25. Miller again replied in the affirmative. *Id.* Detective Lundquist then replied, "Yeah. I mean I can't, I'm not gonna keep you here." [*sic*] *Id.* at 00:25-00:29. Miller emphasized that the end of the driveway was a workable location for the K-9's presence, that she would return in "forty-five minutes or so," and specified the name of the store after Detective Lundquist followed up with more questions. *Id.* at 00:30-00:35. The conversation was steered into a different direction when Detective Lundquist, without pause, inquired into Miller's vehicle that had a "package in the backseat." *Id.* at 00:36-00:54. It appears that Detective Lundquist stepped out of Miller's residence and toward the vehicle, Miller opened the vehicle, and Miller showed the packages to law enforcement. *Id.* at 00:36-01:35. Detective Lundquist immediately returned to Miller's grocery plans: "If you could hang out, I'd rather you be here, while we're doing this. So part of this is, I don't want you to have your stuff without you. So I'd rather you be here for this. Hopefully it won't be long." *Id.* at 01:36-01:52. Miller obliged: "Whatever you want." *Id.* at 01:53-02:01. There is a question or two about the air

---

[5] Def. Ex. D-6 and Gov. Ex. 1 are the same audio recording and will therefore be cited under one *Id.* for efficiency purposes.

conditioner and about King. *Id.* at 02:02-03:30. Miller and law enforcement walked back inside Miller's residence. *Id.* at 03:31-04:20. Refreshments are offered. *Id.* None are served. *Id.* The audio ends with Detective Lundquist and SA Nalley returning to their vehicle. *Id.*

It is unclear how much time elapsed between the law enforcement officials returning to their vehicle and the start of the Def. Ex. D-7 and Gov. Ex. 2[6] audio recording. Miller estimates that it was approximately 20 to 30 minutes after the Def. Ex. D-6 audio recording ends. Dkt. 72 at 5. The government does not specify an approximate time and instead focuses on the arrival of seven law enforcement officials. Dkt. 78 at 3. Equally unclear is when Detective Lundquist had been informed by "Sgt Branson" [*sic*] that "the return address on both the air conditioner and meth parcel were linked to N. Miller. USPI Farmer [*sic*] told me both labels had been created at about the same time and used the same account." Dkt. 78-1.

What is clear is that both law enforcement officials were back inside Miller's residence at the start of the Def. Ex. D-7 and Gov. Ex. 2 audio recording. Detective Lundquist again raised the law enforcement concern that the second package may have contained controlled substances. *Id.* at 00:01-00:21. It appears that Miller was utilizing her cell phone to retrieve her online shipping account while the conversation turned to the identity of the possible shipper. *Id.* at 00:22-01:00. After a multitude of questions from Detective Lundquist, Miller revealed that she had orchestrated the mailing logistics across

---

[6] Def. Ex. D-7 and Gov. Ex. 2 are the same audio recording and will therefore be cited under one *Id.* for efficiency purposes.

multiple states for the second package. *Id.* at 01:01-02:27. This is where the particulars of

the "Industrial Provisions" company start to matter:

> Detective Lundquist: What's the Industrial Provisions? What does that mean?
> Miller: Uh, it's just the name of a company. Of my company.
> Detective Lundquist: Of your company?
> Miller: Yeah.
> Detective Lundquist: Oh. Okay.
> Miller: Well, it's actually Brett's company. It's both of ours. We had it together. When I had paypal.
> Detective Lundquist: Explain it to me.
> Miller: We had a paypal account together.
> Detective Lundquist: Yeah I don't know how that works. Explain it to me.
> Miller: When you had a paypal account, you do a business account, and I guess you put a name on it. Stuff like that.
> Detective Lundquist: So did you put that name on it?
> Miller: Brett put that name on it. Back in the day, when we were working together.
> Detective Lundquist: How did it end up on your package today?
> Miller: I put that on there. I bought the label.
> Detective Lundquist: So how does that work?
> Miller: I printed it off … Yeah I had [someone] send the air conditioner to me.

[*sic*] *Id.* at 02:28-03:47. Detective Lundquist again asked the previous investigatory

questions, and Miller again answered in the affirmative that she had orchestrated the multi-

state shipping logistics for the second package. *Id.* at 03:48-07:00. Miller, however, denied

that she had printed other shipping labels at the time she printed the label for the second

package. *Id.* at 07:01-07:15. More repetitive questions ensued regarding King and mailing

logistics. *Id.* 07:16-09:00. Miller again denied that she had created other labels, and

Detective Lundquist's tone was clearly dubious when he replied, "interesting." *Id.* at 09:01-09:37. The audio at this juncture sounded as if Miller walked away while keys jingled simultaneously. *Id.* at 09:38-10-30. Miller's briefing alleges that Miller was "searching for her truck keys inside the house" during that time interval. Dkt. 72 at 6. Miller then asked, "you guys don't believe me?" with SA Nalley affirming a purported belief in Miller's statements. Def. Ex. D-7, Gov. Ex. 2 at 10:31-11:10. Notably, Miller then asked if she could "change [her] pants. Is that okay?" *Id.* at 11:11-12:10; Dkt. 78-1. About a minute and a half later, SA Nalley asked Miller, "you weren't going to meet anyone, were you?" *Id.* at 12:11-13:25. Miller stated that she had planned to meet a friend at the grocery store." *Id.* at 13:26-14:00. SA Nalley expressed appreciation to Miller for "waiting." *Id.*

### C. Other Law Enforcement Officials Arrive

Reinforcements arrived fourteen minutes into the Def. Ex. D-7 and Gov. Ex. 2 audio recording. *Id.* at 14:01-15:00. The ensemble included two Drug Enforcement Agency agents, three U.S. Postal Service Inspectors, and two other local law enforcement officials. Dkt. 72 at 6-7; Dkt. 78 at 3. About three to four minutes later, Miller asked if her address was on a package, and law enforcement replied affirmatively. Def. Ex. D-7, Gov. Ex. 2 at 15:01-19:00. SA Nalley expressed some concern regarding Miller's movements to find her vehicle's keys, and Miller volunteered that her vehicle could be searched. *Id.* at 19:01-20:00. The audio recording indicates that Miller walked around her residence in search of her vehicle keys but was stopped by SA Nalley right before she stepped outside. *Id.* at 20:01-22:00. It is at this juncture that USPIS Inspector Kevin Horne and DEA Agent

Marcus Chernecke introduce themselves and ask Miller if she would be willing to speak.

*Id.* at 22:01-22:32. Miller muttered, "sure," but Detective Lundquist interjected:

> Detective Lundquist: Kind of just a formality thing … Like you asked to go to the store a little bit ago, and I told you that I wanted you to stay here with us.
> Miller: Yes you did.
> Detective Lundquist: And, so, that basically means, you are not free to leave.
> Miller: Okay.
> Detective Lundquist: And so you're not, as of right now, you're not in any trouble. Not under arrest, nothing like that. But I want to make sure that you are aware of your rights.
> Miller: Okay.

[*sic*] *Id.* at 22:33-22:55. Miller is then *Mirandized*. *Id.* at 22:56-23:30. Another DEA Agent joins Inspector Horne and Agent Chernecke. *Id.* at 23:30-24:20. For the next hour and a half—Miller confessed to her role in the methamphetamine shipment, her affirmative acts of mailing both packages, and her residence and vehicles were consensually searched. *Id.* at 24:21-01:58:27.

The parties disagree on whether Miller invoked her right to counsel. The precise language that Miller used is the source of the disagreement and is critical to this determination. The purported invocation of counsel occurs at about the 50-to-55-minute mark in the Def. Ex. D-7 and Gov. Ex. 2's audio recording. In that recording, Miller's language is  unclear, it sounds as though she says, "I should get a lawyer. I don't know what to do." [*sic*] *Id.* at 51:15-51:29. The audio captured in Gov. Ex. 3 at 26:15-26:28. is clearer in this regard: "Maybe I should get a lawyer. I don't know. What to do." [*sic*]. All three exhibits, on the contrary, capture Agent Chernecke's response in crystal-clear terms:

I'm gonna explain something okay. It's your 100% right to get a lawyer, any time you want. You can also, talk to us. And if there's something you wanna answer at this point, we can table it. Just like I tabled that other thing. But as soon as you definitively say, hey I can't talk to you, and I want a lawyer. We have to step away from this. Just know that if you say that, then you kind of don't have our assistance, right now, anymore. Then we're gonna be like okay, we'll take our evidence to the table, she'll take her evidence to the table, and her lawyer, and we'll see what happens in court. But if you want to answer some questions, we want your cooperation, ultimately … In other words, if we walk away from this now, you're the person we are going to be after … but I don't believe that's true, Brett King is the big fish … having said all that, you still want to kind of feel out what we have to offer here, and what you can offer us, and kind of go through the motions here?"

Def. Ex. D-7, Gov. Ex. 2 at 51:30-53:40; Gov. Ex. 3 at 26:29-28:35. Miller, without hesitation, and with enthusiasm, responds with a "hells yeah." Def. Ex. D-7, Gov. Ex. 2 at 53:41-53:45; Gov. Ex. 3 at 28:36-28:42.

### III.    LEGAL STANDARD

The Fifth Amendment provides that "[n]o person … shall be compelled in any criminal case to be a witness against" themselves. U.S. Const. amend. V. In *Miranda v. Arizona*, 384 U.S. 436, 479 (1966), the Supreme Court ruled that the Fifth Amendment prohibition against self-incrimination requires law enforcement officials to advise defendants of their Fifth Amendment rights before a custodial interrogation begins. It logically follows that a defendant who is subjected to a custodial interrogation without first being advised of their *Miranda* rights will have their answers "excluded from evidence at trial in the [government's] case in chief." *Oregon v. Elstad*, 470 U.S. 298, 317 (1985).

"Fidelity to the doctrine announced in *Miranda* requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated." *Berkemer v. McCarty* 468 U.S. 420, 437 (1984); *see also Michaels v. Davis*, 51 F.4th 904, 921 (9th Cir. 2022) ("The purpose of *Miranda*'s prophylactic protections is to counteract the coercive pressures of the custodial setting by giving the defendant the power to exert some control over the course of the interrogation.") (citation cleaned up).

Law enforcement officials must supply *Miranda* warnings when a defendant is (1) interrogated and (2) in custody. *Miranda*, 384 U.S. at 444.

The interrogation element turns on "whether, in light of all the circumstances, the police should have known that a question was reasonably likely to elicit an incriminating response." *United States v. Williams*, 842 F.3d 1142, 1147 (9th Cir. 2016) (internal quotations omitted). This includes express questioning, routine questioning, or depending on the circumstances, "any words or action on the part of the police that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980); *see also Pennsylvania v. Muniz*, 496 U.S. 582, 610 (1990). In that regard, the perceptions of the defendant being questioned is important to scrutinize. *Pennsylvania*, 496 U.S. at 600-01 (citing *Illinois v. Perkins*, 496 U.S. 292 (1990)).

The custody element "is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508–09 (2012). Custody is therefore not necessarily the same as a Fourth Amendment seizure, instead requiring a "formal arrest or restraint on freedom of movement of the degree

associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)); *see also United States v. Bassignani*, 757 F.3d 879, 883 (9th Cir. 2009). A federal court must examine the totality of the circumstances surrounding the interrogation, with a particular focus "on the objective circumstances of the interrogation, not the subjective views of the officers or individual being questioned." *United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002). In other words, the inquiry involves assessing whether a reasonable person would "have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). The Ninth Circuit has identified five factors relevant to the custody determination: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." *Kim*, 292 F.3d at 974.

As the Ninth Circuit has emphasized: location matters. *United States v. Craighead*, 539 F.3d 1073, 1077 (9th Cir. 2008). *Craighead* stressed that "courts have generally been much less likely to find that an interrogation in the suspect's home was custodial in nature [since] the suspect is in familiar surroundings," and the "element of compulsion concerned the Court in *Miranda* is less likely to be present where the suspect is in familiar surroundings." *Id.* at 1083. Under certain circumstances, the jealously-guarded sanctity of a person's home is converted into a "police-dominated environment," so much so that a reasonable person "may not feel that he can successfully terminate the interrogation if he knows that he cannot empty his home of his interrogators until they have completed their

search." *Id.* Whether there is a police-dominated environment is an inquiry that "is necessarily fact intensive." *Id.* at 1084. *Craighead* offers four additional non-dispositive factors: "(1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made." *Id.* "Other factors may also be pertinent to, and even dispositive of, the ultimate determination whether a reasonable person would have believed he could freely walk away from the interrogators"; the aforementioned factors are simply "ones that recur frequently." *Kim*, 292 F.3d at 974.

## IV.   LEGAL ANALYSIS

This Court has carefully considered the briefings, pertinent portions of the record, and the aforementioned *Kim* and *Craighead* factors. Having done so, this Court concludes that, under the totality of the circumstances, Miller was not subjected to a custodial interrogation at any time throughout questioning by Detective Lundquist and SA Nalley.

It is important to first note that both parties do not address *Miranda*'s interrogation element. *See Rhode Island*, 446 U.S. at 301; *see also Pennsylvania*, 496 U.S. at 600-01; *see also Williams*, 842 F.3d at 1147. The government's briefing omits the element altogether, while Miller presupposes that an interrogation manifested from the outset.

To be clear—Miller was interrogated. *Williams*, 842 F.3d at 1147. Detective Lundquist and SA Nalley peppered Miller with investigatory questions that were intended to discern whether Miller had knowledge of, or had taken affirmative action regarding the

two packages, the mailing addresses, and possible co-conspirators. The content, form, and context of law enforcement questioning revolved around eliciting information relating to the methamphetamine packaging and the ongoing law enforcement investigation. Important here too is that, as the interrogation progressed and Detective Lundquist received additional investigatory information, the accusatory tone of the questioning intensified to the extent that Detective Lundquist may have anticipated incriminating answers. *Compare* Def. Ex. D-4 at 00:01-09:17 *with* Def. Ex. D-7, Gov. Ex. 3 at 00:01-14:00. Law enforcement questioning, in other words, went beyond fact-finding. Indeed, Detective Lundquist repeated the same investigatory questions whenever Miller provided an unsatisfying answer or denied the accusatory or argumentative nature of certain law enforcement questions. A careful review of the audio exhibits also indicates that law enforcement, at times, challenged Miller's statements with other "known facts" that suggested knowledge or guilt of drug trafficking. *See United States v. Norris*, 428 F.3d 907, 912 (9th Cir. 2005). Overall, the questions of law enforcement were within the scope of, and in relation to, their investigation. The government also does not dispute Miller's characterization that Miller was subjected to an interrogation. The July 20, 2021 interactions fit comfortably within the ambit of *Miranda*'s interrogation element. *See Rhode Island*, 446 U.S. at 301; *see also Pennsylvania*, 496 U.S. at 600-01; *see also Williams*, 842 F.3d at 1147.

This Court now turns to the custody element. *Kim*, 292 F.3d at 974; *Craighead*, 539 F.3d at 1084.

*The language used to summon the individual.* Law enforcement did not order Miller to "speak to them," did not order Miller to submit to questioning at a "police station," and the record indicates that law enforcement did not approach Miller in a coercive or confrontational manner. *See Kim*, 292 at 974-75 ("If the police ask—not order—someone to speak to them and that person comes to the police station, voluntarily, precisely to do so, the individual is likely to expect that he can end the encounter."). The two law enforcement officials, at all times, exhibited a calm and non-confrontational tone. Their investigative inquiries could not be reasonably interpreted as commands. *Id.* Moreover, the record establishes that Miller met law enforcement outside her home, before officials had an opportunity to knock. During the course of her interactions with law enforcement, Miller moved freely about her property and her residence. A reasonable person, under these circumstances, would have felt free to end law enforcement interaction or otherwise cease volunteering answers to law enforcement questioning. *See Kim*, 292 F.3d at 974-75; *see also California v. Beheler,* 463 U.S. 1121, 1125 (1982) (holding that defendant was not in custody when he agreed to accompany police to the station to answer questions and was allowed to leave immediately afterward); *Oregon v. Mathiason,* 429 U.S. 492, 495 (1977) (holding that the defendant was not in custody when he came to the station voluntarily and left 'without hindrance' after 30 minutes of questioning)). The principles in *Bassignani*, 575 F.3d at 884, guide this Court as well: "Where we have found an interrogation non-custodial, we have emphasized that the defendant agreed to accompany officers to the police station or to an interrogation room." (citing *United States v. Crawford*, 372 F.3d

1048, 1059 (9th Cir. 2004) and citing *Norris*, 428 F.3d at 912) (citation cleaned up). This factor therefore weighs against a finding of custody. *Kim*, 292 F.3d at 974.

*Extent to which Miller is confronted with evidence of guilt*. Here, as previously mentioned, law enforcement questioning was aimed at eliciting incriminating information. The analysis under the interrogation element applies with equal force to this factor. This factor therefore weighs in favor of a custody finding.

*Physical surroundings of the interrogation*. The government's position that "this factor cuts heavily in favor of the [g]overnment" is well-taken. An interrogation that is conducted "in familiar surroundings weighs against finding that the defendant is in custody." *Bassignani*, 575 U.S. F.3d at 885 (citing *United States v. Eide*, 875 F.3d 1429, 1436 (9th Cir. 1989)). Critical here, as Miller's briefing highlights, is that a federal court is required to consider the additional *Craighead* factors whenever an interrogation occurs at a defendant's residence. Although an analysis involving the *Kim* and *Craighead* factors runs the danger of being "improperly collapse[d]," *Bassignani*, 575 F.3d at 886, the Ninth Circuit has offered useful guidance: *Craighead*'s "approach of using the police-dominated sphere as the benchmark for custodial interrogation in locations outside the police station is consistent with the Supreme Court's adaptations of *Miranda* to these types of locations." *Craighead*, 539 F.3d at 1083-84. The operative question, on that understanding, is whether law enforcement created a police-dominated atmosphere at Miller's residence. This Court will incorporate the *Craighead* factors under this *Kim* factor.

This Court first notes that the record is silent on whether Detective Lundquist and SA Nalley were armed, however, the practice of law enforcement being armed while on

duty is so ubiquitous, it is reasonable for this Court to assume that both Detective Lundquist and SA Nalley were armed. There is, however, nothing in the record to indicate that a firearm was brandished, unholstered, or visible to the extent that it would have indicated that law enforcement came prepared for confrontation. What tips the scale toward a finding against custody is that Miller's freedom or will was not overborne by the presence of *two* on-scene law enforcement officials. *Craighead* is distinguished on this point because there—unlike here—"[e]ight law enforcement officers, representing three different agencies" arrived at the defendant's home from the beginning. Law enforcement officials in this case also did not touch Miller, threaten her, handcuff, or even raise their voice. While the interaction was an interrogation, it was conversational in tone, open, and friendly, with Miller at one point uttering that she "trusted" law enforcement with the temporary possession of the second package. Miller enjoyed unrestricted freedom of movement in and around her residence, which indicates to this Court that Miller reasonably believed that she could depart her residence or retreat to a "police-free" room. Equally important is that the record indicates that Miller was not isolated from the outside world, from the presence of family members, unable to make a telephone call, or that law enforcement neutralized the familiarity of the location. *Kim*, 292 F.3d at 977.

There is a closer question as to whether Miller "was informed that [she] was free to leave or terminate the interview, and the context in which any such statements were made." The two law enforcement officials did not explicitly notify Miller that she was not under arrest or that her statements were voluntary. The government does not explain why such critical information was not provided to Miller from the outset of the interrogation. The

Ninth Circuit, however, has emphasized practical considerations in evaluating a person's perceived freedom to leave. *Kim*, 292 F.3d at 974. Although Detective Lundquist did not explicitly state that Miller was "free to leave," Detective Lundquist responded, "Yeah I mean I can't, I'm not gonna keep you here," when Miller mentioned her plan to buy groceries. A reasonable person would have perceived this as being "informed that [they] were free to leave." On this point, Detective Lundquist's statement that "[he'd] rather [Miller] to be here" for the K-9 inspection, is closer to a recommendation or request than it is to an order or command. This Court's conclusion is further strengthened by Miller's amicable response: "Whatever you want." Moreover, this Court disagrees with Miller that even if law enforcement had provided explicit admonitions, "she would have reasonably understood that any attempt to leave the area would be obstructed or physically impossible." There was little to no restraint on Miller's physical movements, Miller was near her vehicle several times throughout the interrogation, and her vehicle keys were not confiscated. Miller, in other words, had readily available means to leave her residence. This *Craighead* factor presents a close call, made all the more difficult because law enforcement did not explicitly admonish Miller that she was free to leave, but additional facts in the totality of the circumstances lead this Court to conclude that a reasonable person would have felt free to leave. This *Craighead* factor is ambivalent. *Kim*, 292 F.3d at 974; *Craighead*, 539 F.3d at 1083. All other *Craighead* factors weigh against a finding of custody and the *Kim* factor, overall, weighs against a finding of custody.

*Duration of the interrogation*. There is no bright-line rule for this factor: Ninth Circuit jurisprudence "suggest[s] that a two-and-a-half hour interrogation is at the high end.

We have found a defendant not in custody when he was interrogated for more than one hour, *Crawford,* 372 F.3d at 1052, and approximately 45 minutes. *Norris,* 428 F.3d at 911. In contrast, we have found a defendant in custody when she was interrogated for 45 to 90 minutes. *Kim,* 292 F.3d at 972." *Bassignani*, 575 F.3d at 886. Although there were gaps in the interviews, particularly between Def. Ex. D-6 and Def. Ex. D-7, the length of Miller's interrogation is on the higher end of the spectrum. All told, Miller was interrogated for approximately two to three hours. This factor therefore weighs in favor of custody. *Kim*, 292 F.3d at 974.

*Degree of pressure applied to detain the individual*. For reasons stated in the first *Kim* factor, in the third *Kim* factor, and in the *Craighead* factors, this Court concludes that this factor weighs against custody. *Kim*, 292 F.3d at 974.

Under the totality of the circumstances, and as analyzed under the *Craighead* factors and *Kim* factors, this Court concludes that Miller was subjected to an interrogation that was *not* custodial in nature or conducted in a police-dominated atmosphere. Because Miller was not in custody for *Miranda* purposes during Detective Lundquist and SA Nalley's interrogation, both law enforcement officials were not obligated to advise Miller of her *Miranda* rights and no Fifth Amendment violation occurred.

Miller was, however, subjected to a custodial interrogation at the time that additional agents arrived. Inspector Horne and Agent Chernecke introduced themselves, and asked Miller if she would be willing to speak. It is true that Detective Lundquist, just prior to the *Miranda* warnings, stated to Miller, "You asked to go to the store a little bit ago, and I told you that I wanted you to stay here with us … And, so, that basically means,

you are not free to leave." It is important to stress that the "custody determination is objective and not based upon the subject views of law enforcement officials." *Bassignani*, 575 F.3d at 883 (quoting *Kim*, 292 F.3d at 973). The custody analysis for *Miranda* purposes, in other words, is an objective one, and the subjective intent of law enforcement officials is neither conclusive nor controlling. This Court's analysis, as previously iterated, turns on whether a reasonable person would have not felt at "liberty to terminate the interrogation and leave." *Keohane*, 516 U.S. at 112; *see also Stansbury*, 511 U.S. at 322 (custody involves assessing whether there was a ""formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."). On that understanding, this Court's conclusion is unaffected by Detective Lundquist's statements right before admonishing Miller of her *Miranda* rights.

This Court also need not decide Miller's argument regarding "midstream *Miranda* warnings" under *Missouri v. Seibert*, 542 U.S. 600, 621-22 (2004), because a finding of custody is required to properly raise such an argument. "*Seibert* dealt with the admissibility of statements made after the police give midstream warnings, that is, when police begin a *custodial interrogation* without advising the suspect of his *Miranda* rights, obtain incriminating statements, and then continue questioning after administering warnings in order to re-elicit the incriminating statements." *United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1129-30, as amended 416 F.3d 939 (9th Cir. 2005) (emphasis added); *see also Reyes v. Lewis*, 833 F.3d 1001, 1031 (9th Cir. 2016) ("Because the interrogation was custodial, both [courts] concluded that this unwarned confession at the San Bernardino sheriff's station was obtained in violation of *Miranda*."). Even if this Court were to review

Miller's arguments on its merits, Detective Lundquist and SA Nalley did not engage in a deliberate effort to apply the *Seibert* "forbidden two-step technique." As the Ninth Circuit has pointed out, there "is nothing wrong with officers seeking to question a suspect in a non-custodial situation. Rather, this may be viewed as good police work. So long as the officers believed that the interview remained non-custodial, where they turned out to be mistaken, a subsequent, warned confession must be allowed into evidence if voluntarily given." *Reyes*, 833 at 1014-15.

This Court makes one final comment. This Court agrees with the government's characterization of Miller's ambiguous and equivocal request for counsel. A careful review of Gov. Ex. 3 at 26:15-26:28 dispels any doubt in Miller's language: "Maybe I should get a lawyer. I don't know. What to do." [*sic*]. Miller's ambiguous statement was filled with uncertainty and trepidation. It is similar to the statement at issue in *Davis v. United States*, 512 U.S. 452, 463 (1994), where the "petitioner's remark to [law enforcement officials]— 'Maybe I should talk to a lawyer'—was not a request for counsel, and we see no reason to disturb that conclusion. The [law enforcement officials] therefore were not required to stop questioning petitioner, though it was entirely proper for them to clarify whether petitioner in fact wanted a lawyer." The Ninth Circuit has likewise ruled that a defendant did not unambiguously invoke their right to counsel when the defendant stated, "I don't know if I should without an attorney." *Michaels v. Davis*, 51 F.4th 904, 923 (9th Cir. 2022). Moreover, a reasonable law enforcement official, in light of the context and the circumstances, would not have interpreted Miller's statement as an unambiguous and unequivocal request for counsel. *Davis*, 512 U.S. at 459.

This Court concludes that Miller did not unambiguously invoke her right to counsel and law enforcement officials were not required to cease the interrogation at that point.

## V.    CONCLUSION

For the reasons set forth above, Miller's Motion to Suppress should be **DENIED**. 28 U.S.C. § 636(b)(1)(B).

DATED this 16th day of December, 2022, at Anchorage, Alaska.

*s/ Matthew M. Scoble*
CHIEF U.S. MAGISTRATE JUDGE

Pursuant to D. Alaska Loc. Mag. R. 6(a), a party seeking to object to this proposed finding and recommendation shall file written objections with the Clerk of Court no later than the CLOSE OF BUSINESS on December 23, 2022. Failure to object to a magistrate judge's findings of fact may be treated as a procedural default and waiver of the right to contest those findings on appeal. Miranda v. Anchondo, et al., 684 F.3d 844 (9th Cir. 2012). The Ninth Circuit concludes that a district court is not required to consider evidence introduced for the first time in a party's objection to a magistrate judge's recommendation. United States v. Howell, 231 F.3d 615 (9th Cir. 2000). Objections and responses shall not exceed five (5) pages in length, and shall not merely reargue positions presented in motion papers. Rather, objections and responses shall specifically designate the findings or recommendations objected to, the basis of the objection, and the points and authorities in support. The parties shall otherwise comply with provisions of D. Alaska Loc. Mag. R. 6(a). Reports and recommendations are not appealable orders. Any notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the District Court's judgment. See Hilliard v. Kincheloe, 796 F.2d 308 (9th Cir. 1986).