IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

*United States of America v. Nancy Marie Miller*
Case No. 1:21-cr-00011-TMB-MMS

By: THE HONORABLE TIMOTHY M. BURGESS

PROCEEDINGS: ORDER FROM CHAMBERS

The matter comes before the Court on the Final Report and Recommendation ("R&R") of Chief Magistrate Judge Scoble[1] recommending the Court deny Defendant Nancy Marie Miller's Motion to Suppress Statements Derived from Custodial Interrogation Pursuant to *Miranda v. Arizona*[2] and *Missouri v. Seibert*[3] at Docket 72 (the "Motion").[4] Miller objects to the R&R.[5] After a *de novo* determination of those portions of the R&R objected to by Miller,[6] and for the reasons discussed below, the Court **ACCEPTS and ADOPTS** the R&R at Docket 84. Consequently, the Motion at Docket 72 is **DENIED**.

*A. Background*

Miller is charged by indictment on three counts: (1) Attempted Possession with the Intent to Distribute a Controlled Substance;[7] (2) Possession with the Intent to Distribute Controlled Substances;[8] and (3) Possession of Firearms in Furtherance of Drug Trafficking.[9]

---

[1] Dkt. 84 (R&R).
[2] 384 U.S. 436 (1966).
[3] 542 U.S. 600 (2004).
[4] Dkt. 72 (Motion).
[5] Dkt. 98 (Miller Objections).
[6] 28 U.S.C. § 636(b)(1)(C) ("Within fourteen days after being served with a copy [of the magistrate judge's proposed findings and recommendations], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject or modify, in whole or in part, the findings or recommendations made by the magistrate judge.").
[7] Dkt. 2 (Indictment); 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A).
[8] Dkt. 2; *see* 21 U.S.C. § 841(a)(1), (b)(1)(A).
[9] Dkt. 2; *see* 18 U.S.C. § 924(c)(1)(A)(i).

1

On July 20, 2021, Juneau resident Terry Miller ("Terry")[10] notified the police that he had been sent a package with what he believed to be drugs or salt.[11] The return address on the package stated "Nance Miller, Industrial Provisions" located in Belfair, Washington.[12] At around 4:30 p.m., the police confirmed that the package's contents had field tested positive for methamphetamine.[13] Juneau Police Department ("JPD") Officer Dominic Branson then contacted Terry and interviewed him over the phone. During this conversation, Terry shared that he did not use methamphetamine and, when asked if he knew anyone that did, he stated that a former employee, Brett King, was a methamphetamine user.[14] Officer Branson knew that Miller was Terry's niece and that King and Miller had dated in the past.[15]

After this interview, United States Postal Inspection Service ("USPIS") Special Agent Christopher Farmer discovered that a "second parcel with the same return shipping address was mailed to a residence on Oceanview Drive contemporaneous to the parcel mailed to [Terry]," and that this second parcel was addressed to "Nance Miller."[16] JPD Detective Carl Lundquist then contacted Miller; in their conversation she confirmed that she had "picked up [the second parcel, an air conditioner,] from the post office."[17]

At around 5:10 p.m., Detective Lundquist and United States Postal Service Special Agent Charles Nalley arrived at Miller's residence, where Miller opened the door before the officers were able to knock.[18] The officers began speaking with Miller and she initially denied knowledge of the parcel shipped to Terry's home. Only later did she state that her "ex-boyfriend Brett King and other individuals had used her residence to deliver packages in the past, and that she believed the packages contained controlled substances."[19]

At around 5:35 p.m., Detective Lundquist and Special Agent Nalley asked Miller for permission to take the second package (the air conditioner) into their custody; Miller agreed.[20] Soon after, Detective Lundquist asked Miller if she was planning to the leave the property because a drug detection dog was on its way to the residence and he wanted her to be present for its arrival.[21] Miller replied that she was planning to go to the supermarket, to which Detective Lundquist responded, "I'm not going to keep you here." Miller then replied that he could wait outside while

---

[10] To avoid confusion between Terry Miller and Defendant Nancy Marie Miller, the Court will refer to Terry Miller by his first name throughout this Order.
[11] For a detailed representation of these facts, please refer to the R&R at Docket 84. *See also* Dkt. 72 at 2; Dkt 79-1 (Cryderman Incident Report); Dkt. 79-2 (Lundquist Incident Report); Dkt. 78 at 2 (Opposition).
[12] Dkt. 72 at 2; Dkt 79-2.
[13] Dkt. 72 at 3; Dkt 79-2.
[14] Dkt. 79-3.
[15] *Id.*
[16] *Id.*
[17] *Id.*; *see* Dkt. 78 at 2.
[18] Dkt. 79-2; Dkt. 79-3.
[19] Dkt. 72 at 4.
[20] *Id.*; Def. Ex. D-5 Dkt. 156.
[21] Dkt. 72 at 4; Def. Ex. D-6 Dkt 157; Dkt. 78 at 2.

2

she was away and that she would be away for forty-five minutes. The two continued their conversation and around 5:42 p.m., Detective Lundquist told Miller, "[i]f you could hang out, I'd rather you be here while we're doing this, cause, so part of this is you know, I don't want to have your stuff without you, so I'd rather for you to be here for this."[22] Miller agreed and remained on the property while Detective Lundquist continued to ask her questions.[23]

During this time, Miller shared that she had received the air conditioner from a friend in Washington because the shipper would not send the air conditioner directly to her residence in Juneau. She also admitted that she had a shared PayPal account with King under the name of purported business, "Industrial Provisions."[24]

Around 6:30 p.m., seven additional law enforcement officers from various state and federal agencies arrived at Miller's residence.[25] At that point, Detective Lundquist, acknowledged that when he had previously told Miller that he wanted her to stay on the premises, he had "[meant] that [she was] not free to leave." Detective Lundquist continued by saying that although she was not "in any trouble" or "under arrest," he wanted to "make sure that [she was] aware of [her] rights."[26] Miller responded affirmatively, and Detective Lundquist proceeded to inform her of her Miranda rights.[27]

At this point, USPIS Special Agent Kevin Horne and Agent Marcus Chernecke continued questioning Miller, asking her about the two parcels.[28] After nearly an hour of questioning, Miller stated, "Maybe I need an attorney. I don't know what to do."[29] In response, Special Agent Horne said:

> I'm going to explain something to you, okay? It's your 100% right to get a lawyer any time you want. You can also talk to us, and if there's something that you want to answer at this point, we can table it, just like I tabled the other thing. But as soon as you definitively say, hey, I can't talk to you and I want a lawyer, we have to step away from this.[30]

---

[22] Dkt. 72 at 5; Dkt. 78 at 2–3.
[23] Dkt. 72 at 5; Dkt. 157; Dkt. 78 at 2–3.
[24] Dkt. 72 at 6; Dkt. 158.
[25] Dkt. 72 at 6–7; Dkt. 78 at 3.
[26] Dkt. 72 at 7; Def. Ex. D-7 (minute 22:30-23:20).
[27] Def. Ex. D-7 (minute 22:30-23:20); Dkt. 78 at 3; Dkt. 72 at 8.
[28] Dkt. 72 at 7–8.
[29] Miller claims she began her statement with the phrase, "I need to see a lawyer." The Government contends that Miller stated, "Maybe I should get a lawyer." After reviewing the recording, the Court agrees with the Government, finding that Miller stated "Maybe I should get a lawyer. I don't know what to do." Def. Ex. D-7 (minute 51:00-53:43); Gov. Ex. 3 (minute 26:15-26:28); Dkt. 72 at 8–9; Dkt. 78 at 3.
[30] Dkt. 72 at 8; Dkt. 78 at 8.

Special Agent Horne then stated that law enforcement was interested in learning who was responsible for this drug shipment and clarified that law enforcement did not think Miller was the "puppet master" in this case. He followed this by asking, "Do you still want to kind of feel out what we have to offer here and what you can offer us? And kind of go through the motions here?" Miller responded enthusiastically by exclaiming, "Hells yeah!"[31]

The interrogation continued and Miller "proceeded to confess to her involvement in the shipping of the drugs to Alaska and her possession of drugs on the property."[32] She also admitted "to having accidentally mailed the package containing controlled substances to Terry Miller's address" and then consented to having her property searched, which resulted in the discovery of "large bundles of cash and controlled substances in various areas of her residence," along with firearms.[33] Miller's cell phones were also "seized pending a search warrant."[34]

### B. *Motion to Suppress Statements Derived from Custodial Interrogation*

In the Motion, Miller asks the Court to suppress "statements and admissions obtained in violation of [her] constitutional right against compelled custodial interrogation under *Miranda v. Arizona*."[35] Specifically, Miller requests the Court suppress: (1) "all of Ms. Miller's post-warning statements because the record establishes that Det[ective] Lundquist deliberately withheld providing Ms. Miller with Miranda advisements;" and (2) "any statements Ms. Miller made after attempting to invoke her right to counsel . . . as law enforcement agents failed to honor her invocation and cease the interrogation."[36]

First, Miller argues that "a reasonable person in [her] position would have understood that she was not free to terminate the encounter [with law enforcement]."[37] Applying a "totality of the circumstances analysis," Miller bases her position on the following factors:[38] (1) she was "initially contacted as a part of a state and federal criminal investigation regarding suspected drug distribution activity" at her home; (2) she was confronted with "evidence of guilt" and as "the interrogation progressed and it became clear that she was now a suspect, Ms. Miller's answers became increasingly curt"; (3) her home became a "police-dominated atmosphere" with the presence of nine law enforcement officers; (4) she was advised of her Miranda rights after police had been at her house for an hour and a half, remaining at her residence for a total of three hours; and (5) her "physical movements were limited and controlled by the agents" and no other persons were present during the police interrogation.[39]

---

[31] Def. Ex. D-7 (minute 53:33-54:00); Dkt. 78 at 3.
[32] Dkt. 72 at 9; Dkt. 78 at 4.
[33] Dkt. 72 at 9; Dkt. 78 at 4.
[34] Dkt. 72 at 9.
[35] *Id.* at 1.
[36] *Id.* at 9.
[37] *Id.* at 10.
[38] *Id.* at 10 (citing *United States v. Hayden*, 260 F.3d 1062, 1066 (9th Cir. 2001)).
[39] *Id.* at 10–15.

Miller contends that because she was in custody, her eventual Miranda advisements were ineffective because law enforcement deliberately refrained from providing them to her.[40] Miller cites Justice Kennedy's concurrence in *Missouri v. Seibert*,[41] and concludes that the audio recordings demonstrate the Detective Lundquist "deliberately withheld providing Ms. Miller with Miranda advisements."[42] As such, Miller argues that the later "mid-stream *Miranda* warning" was insufficient because the law enforcement officers did not take "curative measures" and downplayed the importance of the eventual *Miranda* advisal.[43]

Second, Miller contends that "[e]ven if the mid-stream Miranda advisement was effective, Miller unequivocally invoked her right [to] counsel during the subsequent interrogation" and "her request was not respected."[44] Miller concludes that she "unambiguously asserted her right to counsel and the officers' flagrant refusal to honor her request renders her subsequent statements inadmissible."[45]

The Government opposes the Motion.[46] First, the Government argues that the evidence obtained through the officers' questioning of Miller should not be suppressed because "Miller was not in custody when she was initially interviewed" and was read her *Miranda* warnings only "once she was in a custodial setting."[47] Alternatively, the Government asserts that if the Court finds "the initial questioning of Miller was custodial, the officers did not treat the situation as a two-step interrogation as recognized by *Missouri v. Seibert*.[48] Second, the Government contends that Miller's "statement regarding counsel" was ambiguous and "no reasonable officer would have concluded that Miller was invoking her right to counsel."[49]

### C. Final Report and Recommendation

Chief Magistrate Judge Scoble recommends the Court deny the Motion, determining that (1) Miller was not in custodial interrogation at any time throughout the questioning by Detective Lundquist and Special Agent Nalley; and (2) Miller did not properly invoke her right to counsel.[50]

Addressing the issue of whether Miller was in custodial interrogation, the Magistrate Judge first clarifies that Miller was interrogated at her home, recognizing that Detective Lundquist and Special Agent Nalley "peppered Miller with investigatory questions that were intended to discern

---

[40] *Id.* at 15.
[41] 542 U.S. 600 (2004).
[42] Dkt 72 at 17.
[43] *Id.* at 20.
[44] *Id.* at 21.
[45] *Id.* at 23–24.
[46] Dkt. 78.
[47] *Id.* at 7.
[48] *Id.* at 7.
[49] *Id.* at 11–12.
[50] Dkt. 84 at 15–24.

whether Miller had knowledge of, or had taken affirmative action regarding the two packages, the mailing addresses, and possible co-conspirators."[51]

The Magistrate Judge confirms that Miller was not in custody prior to being read her *Miranda* warnings. The Magistrate Judge reasons that, when reviewing the totality of the circumstances,[52] "Miller was subjected to an interrogation that was not custodial in nature or conducted in a police-dominated atmosphere" when chatting with the two first two law enforcement officers that first arrived at her residence.[53] "Because Miller was not in custody for *Miranda* purposes during Detective Lundquist and [Special Agent] Nalley's interrogation, neither law enforcement official was obligated to advise Miller of her *Miranda* rights and no Fifth Amendment violation occurred."[54]

However, the Magistrate Judge determines that Miller was "subjected to a custodial interrogation at the time that additional agents arrived."[55] Although the Magistrate Judge recognizes that it was "true that Detective Lundquist, just prior to the Miranda warnings, told Miller, 'You asked to go to the store a little bit ago, and I told you that I wanted you to stay here with us … And, so, that basically means, you are not free to leave,'" the Magistrate Judge emphasizes that "custody determination is objective and not based upon the subject views of law enforcement officials."[56] Since the Magistrate Judge's analysis turned on an assessment of the objective facts and whether a "reasonable person would have not felt 'at liberty to terminate the interrogation and leave,'"[57] the conclusion that Miller was not in custody is not affected by Detective Lundquist's later admissions.

Because the Magistrate Judge finds that Miller was not in custody, he concludes that the Court "need not decide Miller's argument regarding 'midstream Miranda warnings' under *Missouri v. Seibert* . . . because a finding of custody is required to properly raise such an argument."[58]

---

[51] *Id.* at 13, 15–16 (citing *United States v. Williams*, 842 F.3d 1142, 1147 (9th Cir. 2016)).
[52] *See United States v. Craighead*, 539 F.3d 1073, 1077-1084 (9th Cir. 2008); (Craighead stressed that "courts have generally been much less likely to find that an interrogation in the suspect's home was custodial in nature [since] the suspect is in familiar surroundings," and the "element of compulsion concerned the Court in *Miranda* is less likely to be present where the suspect is in familiar surroundings."); *United States v. Kim*, 292 F.3d 969, 973–74 (9th Cir. 2002) (The Ninth Circuit has identified five factors relevant to the custody determination: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual."); *see also* Dkt. 84 at 14–15 (citing *Craighead* and *Kim*).
[53] Dkt. 84 at 16–21.
[54] *Id.* at 21.
[55] *Id.*
[56] *Id.* at 14, 22 (citing *United States v. Bassignani*, 757 F.3d 879, 883 (9th Cir. 2009) (quoting *Kim*, 292 F.3d at 973)).
[57] *Id.* at 14, 22 (citing *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)).
[58] *Id.* at 22.

6

The Magistrate Judge then "agrees with the [G]overnment's characterization of Miller's ambiguous and equivocal request for counsel."[59] The Magistrate Judge reasons that Miller's ambiguous statement, "Maybe I should get a lawyer. I don't know what to do," "was filled with uncertainty and trepidation," finding this statement to be akin to the statement at issue in *Davis v. United States*.[60] In *Davis*, the United States Supreme Court concluded that because this petitioner's statement was not an unequivocal invocation, law enforcement officers "were not required to stop questioning petitioner, though it was entirely proper for them to clarify whether petitioner in fact wanted a lawyer."[61] Consequently, the Magistrate Judge concludes that "a reasonable law enforcement official, in light of the context and the circumstances, would not have interpreted Miller's statement as an unambiguous and unequivocal request for counsel."[62] As such, "Miller did not unambiguously invoke her right to counsel and law enforcement officials were not required to cease the interrogation at that point."[63]

### D. Objections

Miller files seven objections to the R&R, outlined as follows.[64] First, Miller argues that the Magistrate Judge "misstates *United States v. Kim*[65] with respect to the voluntariness of a police encounter."[66] Miller asserts that *Kim* demands a "more thorough inquiry" and "stands for the proposition that an *initially* voluntary encounter may become involuntary under circumstances much like [Miller's]."[67] Miller concludes that because the R&R "fails to apply the analysis in *Kim*," its conclusion regarding the "voluntariness of [Miller's] encounter must be rejected."[68]

Second, Miller argues that the R&R "erroneously concludes that law enforcement did not confront [her] with evidence of guilt and that this weighs in favor of a finding that [she] was not in custody."[69] Miller asserts that this conclusion is "not supported by the record" because "after [she] denied knowing about any shipment to [Terry's] residence, law enforcement responded that the parcel in fact contained 'a lot of drugs.'"[70]

Third, Miller objects to the R&R's finding that Miller was "not in custody" because there were "only two officers on the scene and such a number could not have 'overborne' her freedom or will."[71] Likewise, Miller argues that she "did not enjoy unrestricted freedom of movement" and objects to the finding that the "presence of law enforcement did not neutralize the familiarity of

---

[59] *Id.*
[60] 512 U.S. 452, 463 (1994); Dkt. 84 at 23 (citing Gov. Ex. 3 at minute 26:15-26:28).
[61] Dkt. 84 at 23 (citing *Davis*, 512 U.S. at 463).
[62] *Id.* (citing *Davis*, 512 U.S. at 459).
[63] *Id.* at 24.
[64] *See generally* Dkt. 84; Dkt. 98.
[65] 292 F.3d 969, 974 (9th Cir. 2002).
[66] Dkt. 98 at 1–2.
[67] *Id.* at 1.
[68] *Id.* at 2.
[69] *Id.*
[70] *Id.*
[71] *Id.*

7

her location [her home]."⁷² As such, Miller concludes that "[n]o reasonable person in her circumstances would conclude they could simply walk into another room or drive away to prevent further questioning."⁷³

Fourth, Miller asserts that the R&R "erroneously concludes that the degree of pressure applied to [her] weighs against finding she was in custody."⁷⁴ Specifically, Miller argues that she was in custody because she was told that: (1) a parcel contained "a lot of drugs"; (2) a drug-detecting dog would be arriving; (3) she should not "go to the store as she had planned"; and (4) she should "stop searching for her truck keys just before seven additional law enforcement officers arrived."⁷⁵

Fifth, Miller argues that because she was in custody, the R&R's "subsequent *Miranda* findings must be rejected."⁷⁶

Sixth, Miller argues that the R&R "erroneously concludes that the [law enforcement] officers did not deliberately withhold the Miranda advisement."⁷⁷ Miller asserts that this conclusion fails because it applies "circular reasoning that because [she] was not in custody, [withholding the Miranda advisement] was in fact 'good police work,'" and ignores the Motion's previous arguments "in anticipation of such an objection."⁷⁸

Finally, Miller contends that the R&R "erroneously concludes that [her] invocation of her right to counsel was ambiguous," claiming that she stated, "maybe I *need* to see a lawyer."⁷⁹ In addition, Miller argues that the R&R "ignores the *Edwards* analysis offered in anticipation of this argument."⁸⁰

The Government does not object to the R&R.

### E. Discussion

Having reviewed the R&R, Miller's objections, the relevant audio recordings, and the record, the Court concludes that the seven objections do not merit revision or rejection of the R&R.⁸¹ The Court assesses each of Miller's objections in turn.

First, the Magistrate Judge did not misapply the legal proposition laid out in *Kim*. In *Kim*, the Ninth Circuit highlighted that the voluntary initiation of contact with the police is not the "end of the inquiry into whether a defendant was 'in custody' during [an] encounter [with the police],"

---

⁷² *Id.*
⁷³ *Id.*
⁷⁴ *Id.* at 3.
⁷⁵ *Id.*
⁷⁶ *Id.*
⁷⁷ *Id.*
⁷⁸ *Id.* (citing Dkt. 72 at 17–19).
⁷⁹ *Id.*
⁸⁰ Dkt. 84 at 3 (citing Dkt. 72 at 21–23).
⁸¹ *See generally* Dkt. 98.

8

specifying that an important additional focus is whether law enforcement "established a setting from which a reasonable person would believe that he or she was not free to leave."[82] The court outlined five factors that are "likely to be relevant to deciding" the question of custody: "'(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual.'"[83]

In this case, the Magistrate Judge correctly applied the *Kim* factors and did not rely solely on the fact of Miller's voluntary initiation of contact with the police. Indeed, the R&R comprehensively applies the five *Kim* factors, expanding far beyond the single inquiry of whether Miller voluntarily initiated contact with law enforcement by opening the door to her residence upon the two officer's arrival.[84] Because the Magistrate Judge assessed the five factors relevant to the totality of the circumstances as instructed by *Kim*—an analysis that is well-supported by the record and relevant audio recordings—Miller's first objection does not warrant alteration of the R&R.

Second, Miller's objection misconstrues the Magistrate Judge's finding regarding the second *Kim* factor.[85] Although the Magistrate Judge concluded that this factor "weigh[ed] in favor of a custody finding, Miller seems to imply that the Magistrate Judge arrived at the opposite conclusion.[86] In any case, the Magistrate Judge accurately assessed the "extent to which Miller [was] confronted with evidence of guilt."[87] In doing so, the Magistrate Judge concluded that because "law enforcement questioning was aimed at eliciting incriminating information," the "analysis under the interrogation element [of the Miranda analysis] applies with equal force to this factor," weighing "*in favor of* a custody finding."[88] Since the Magistrate Judge correctly assessed the facts of this case and concluded that it weighed *in favor* of a custody finding, this aspect of the R&R does not require alteration.[89]

---

[82] *Id.* at 973–974 (quoting *Stansbury v. California*, 511 U.S. 318, 322 (1994).
[83] *Kim*, F.3d at 974; *see* Dkt. 98 at 1.
[84] Dkt. 79-2; Dkt. 79-3.
[85] 292 F.3d at 974 ("(2) the extent to which the defendant is confronted with evidence of guilt").
[86] Dkt. 98 at 2 ("The Report erroneously concludes that law enforcement did not confront Ms. Miller with evidence of guilt and this weighs in favor of a finding that Ms. Miller was not in custody.").
[87] Dkt. 84 at 18.
[88] *Id.* (emphasis added); *see also id.* at 15–16 (assessing whether Miller was interrogated for purposes of the *Miranda* custody analysis).
[89] Dkt. 98 at 2.

Third, the Magistrate Judge's analysis of the third *Kim* factor,[90] and his additional considerations under *Craighead*,[91] do not warrant revision.[92] The Magistrate Judge concluded that "[w]hat tips the scale toward a finding against custody is that Miller's freedom or will was not overborne by the presence of *two* on-scene law enforcement officials," a fact distinguished from the eight on-scene officers in *Craighead*.[93] This conclusion is supported by the various audio recordings of Miller's encounter with the two initial law enforcement officers, which could be described as casual, "open," and "friendly."[94] Likewise, the record reflects that Miller "enjoyed unrestricted freedom of movement in and around her residence," evinced by her movement from the residence to the mail box package delivery location and extensive search for her truck keys around the premises. Although at various points Miller expresses her desire to visit a supermarket, the audio recordings reflect that at no point did the officers obligate her to remain at her residence—they merely *requested* she remain at home.[95] As such, the R&R reaches the correct conclusion with respect to the operative question of whether Miller was in custody for *Miranda* purposes, which rests on "whether law enforcement created a police-dominated atmosphere at [her] residence."[96] Because law enforcement did not create a "police-dominated atmosphere," this aspect of the R&R does not require alteration.

Fourth, the R&R did not err in concluding that the fifth *Kim* factor,[97] which weighed against the finding that Miller was in custody.[98] The R&R correctly finds that under the totality of the circumstances and under the third *Kim* factor, as supported by the relevant audio recordings, Miller was not under such pressure that would indicate she was in custody.[99] As explained in the analysis of the first three objections, this objection does not warrant revision of the R&R.

Fifth, because the Magistrate Judge did not err in his conclusion that Miller was not in custody, it is not appropriate for the R&R's "subsequent *Miranda* findings [to] be rejected."[100] Ultimately, as discussed in the previous assessments of Miller's objections, through an accurate application of the relevant law, the Magistrate Judge correctly concluded that "Miller was subjected to

---

[90] 292 F.3d at 974 ("(3) the physical surroundings of the interrogation")
[91] 539 F.3d at 1077 ("courts have generally been much less likely to find that an interrogation in the suspect's home was custodial in nature [since] the suspect is in familiar surroundings," and the "element of compulsion concerned the Court in *Miranda* is less likely to be present where the suspect is in familiar surroundings.").
[92] Dkt. 84 at 18–20.
[93] *Id.* at 19.
[94] *Id.*; *see generally* Def. Ex. D-7; Gov. Ex. 1–3.
[95] Def. Ex. D-6 at 01:36-01:52 (For example, Officer states, "If you could hang out, I'd rather you be here, while we're doing this. So part of this is, I don't want you to have your stuff without you. So I'd rather you be here for this. Hopefully it won't be long."); *see generally* Def. Ex. D-4–D-7; Gov. Ex. 2.
[96] Dkt. 98 at 18–19.
[97] 292 F.3d at 974 ("[d]egree of pressure applied to detain [Miller]").
[98] Dkt. 84 at 21.
[99] *Id.* at 21.
[100] *See id.*; Dkt. 98 at 3.

interrogation that was *not* custodial in nature or conducted in a police-dominated environment."[101] Therefore, this aspect of the R&R does not require revision.

Sixth, the R&R was correct in its conclusion that law enforcement officers did not deliberately withhold their *Miranda* advisement prior to the arrival of the additional law enforcement officers.[102] Miller's argument regarding "midstream *Miranda* warnings" under *Missouri v. Seibert*[103] is inapplicable because the totality of the circumstances indicate that she was not in custody—a required element of the *Seibert* test.[104] The Magistrate Judge correctly concluded that the law enforcement officers did not engage in the "forbidden two-step technique"[105] from *Seibert*, citing valid Ninth Circuit caselaw for the proposition that there "is nothing wrong with officers seeking to question a suspect in a non-custodial situation. . . . So long as the officers believed that the interview remained non-custodial, where they turned out to be mistaken, a subsequent, warned confession must be allowed into evidence if voluntarily given."[106] Because Miller's interview with the two officers remained non-custodial, this aspect of the R&R does not require revision.

Finally, the Magistrate Judge's finding that Miller's request for counsel was "ambiguous and equivocal" was correct.[107] The Court agrees that a "careful review of Gov. Ex. 3 at 26:15-26:28 dispels any doubt in Miller's language: 'Maybe I should get a lawyer. I don't know. What to do.'"[108] This statement is similar to the statement at issue in *Davis v. United States*,[109] where the petitioner stated, "Maybe I should talk to a lawyer." In *Davis*, the Supreme Court held that law enforcement officers were not required to stop questioning the petitioner, however "it was entirely proper for them to clarify whether the petitioner in fact wanted a lawyer."[110] This controlling case, along with similar rulings from the Ninth Circuit,[111] demonstrate that Miller's invocation was neither unambiguous nor unequivocal, and law enforcement was not required to stop interrogation at that point.[112] Therefore, the R&R does not require revision as to Miller's request for counsel.

   *F.  Conclusion*

---

[101] Dkt. 84 at 21 (emphasis in original).
[102] *Id.* at 21–22.
[103] 542 U.S. 600, 621–22 (2004)
[104] *See* Dkt. 84 at 22–23.
[105] The "two-step" technique in Siebert, refers to a "question first" tactic in which law enforcement chooses not to *Mirandize* an individual in custody in order to elicit an incriminating confession, and then gives a Miranda warning mid-interrogation. This two-step interrogation tactic makes a repeated incriminating statement made after the warning to be inadmissible at trial. *See Siebert*, 542 at 604.
[106] *Id.* at 23 (citing *Reyes v. Lewis*, 833 F.3d 1001, 1031 (9th Cir. 2016).
[107] *Id.*
[108] *Id.*
[109] 512 U.S. 452, 463 (1994).
[110] *Id.*; Dkt. 84 at 23.
[111] *E.g.*, *Michaels v. Davis*, 51 F.4th 904, 923 (9th Cir. 2022).
[112] Dkt. 84 at 23–24.

11

The Court concludes that Miller's objections do not merit revision or rejection of the R&R. Accordingly, the Court **ACCEPTS AND ADOPTS** the R&R at Docket 84. Consequently, the Motion at Docket 72 is **DENIED**.

Entered at the direction of the Honorable Timothy M. Burgess, United States District Judge.

DATE: January 5, 2023.